UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:                                          Case Number: 16-11090-7

FREDERICK J. FURRER
and LUCY FURRER,

Debtors.

HYRAD CORPORATION and
HOWARD C. NELSON,

Plaintiffs,

v.                                              Adversary Number: 16-49

FREDERICK J. FURRER,

Defendant.

## MEMORANDUM DECISION

This matter is before the Court on the motion of HYRAD Corporation and
Howard Nelson ("Hyrad" or "Nelson" individually, and collectively the
"Plaintiffs") for summary judgment on their adversary complaint against
Frederick Furrer ("Furrer"). The Plaintiffs contend that facts determined in
Columbia County Circuit Court render Furrer's debt to the Plaintiffs
nondischargeable as either a debt based on fraud or defalcation while acting in
a fiduciary capacity or as an embezzlement, *see* 11 U.S.C. § 523(a)(4), or based
on a willful and malicious injury, *see* 11 U.S.C. § 523(a)(6). Further, they assert
that Furrer is precluded from relitigating those facts. For the reasons that
follow, the Plaintiffs' motion for summary judgment is granted.

## JURISDICTION

Federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code "). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Western District of Wisconsin has referred all of its bankruptcy cases to the Bankruptcy Court for the Western District of Wisconsin. Western District of Wisconsin Administrative Order 161 (July 12, 1984).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding for determination of the dischargeability of a particular debt arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(I).

None of the parties have raised the issue of whether this Court has constitutional authority to enter a final judgment on all counts of the Complaint in light of the United States Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011). This Court has an independent duty to determine whether it has such authority. *Rutkowski v. Adas (In re Adas),* 488 B.R. 358, 379 (Bankr. N.D. Ill. 2013).

2

All of the counts in the Complaint are based on sections 523(a)(4) and (6) of the Bankruptcy Code. Section 523 is unequivocally a bankruptcy cause of action. Determining the scope of a discharge is a fundamental part of the bankruptcy process even when it implicates state law. *See Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 20 (B.A.P. 9th Cir. 2012).

Thus, even in light of the Seventh Circuit's later opinions regarding *Stern, see Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013), and *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906 (7th Cir. 2011), the Court concludes it has constitutional authority to enter a final judgment in this adversary proceeding.

Accordingly, this Court has both the jurisdiction and the authority to enter final judgment in this matter. Hence, this decision contains the Court's findings of fact and conclusions of law.

## FACTS

Hyrad was incorporated in 1989 and received a U.S. Patent the same year for an adjustable shock absorber.  Since 1994, the Hyrad shares have been owned by Nelson, Furrer, and James Strickland. Nelson was a Hyrad director from 1995 to 2006. He was the treasurer from 1995 to 2001 and a vice-president from 1995 until 2005. Furrer served as the president of Hyrad. He also served as its treasurer from 2001 through the periods at issue.

Bumps in the road developed and, in 2007, Nelson brought an action against Furrer asserting various claims on his own behalf and that of Hyrad. The claims were for theft, breach of fiduciary duties, improper retention of corporate funds, and improperly receiving unauthorized payments. Following six days of trial, the state court issued a Memorandum Decision, Findings of Fact and Conclusions of Law, and a Judgment.

The following facts were determined by the state court:

a.  The officers and directors of Hyrad were authorized by its bylaws to exercise all business powers of the corporation, including entering into contracts for employee compensation.

b.  Leader Corporation, a company wholly owned by Furrer, provided management services to Hyrad. It also functioned as Furrer's management company for the purpose of accepting his compensation.

c.  Furrer and Leader failed to prove that all of the money paid by Hyrad to Leader was for actual business expenses for the benefit of Hyrad during the years 2001 through the first half of 2009.

d.  Hyrad paid insurance premiums for Furrer's personal property, undocumented personal travel expenses, rent and utility expenses, and other amounts for the personal benefit of Furrer and his family between 2001 and 2007.

e.  Furrer caused Hyrad to pay Leader $25,412 in unsubstantiated expenses that directly benefitted Furrer.

f.   Furrer received excess compensation not authorized by the Board of Hyrad.

g.   Furrer paid himself excess compensation in the amount of $184,735.

h.   The actual damages Hyrad incurred as a result of Furrer's actions in paragraph g. totaled $184,735.

i.   Additionally, Furrer paid himself excess compensation through his subsidiary corporations in the amount of $21,211.15.

j.   The actual damages Hyrad incurred as a result of Furrer paying himself through his subsidiary corporations totaled $21,211.15.

k.   The sum of Hyrad's actual damages incurred as a result of Furrer's actions totaled $205,946.15.

l.   Actual damages are subject to an award of 12% interest per annum under Wis. Stat. § 814.04(4) from the date of the state court's decision forward on any and all liquidated amounts found owing.

m.   Hyrad's actual damages, with statutory interest, totaled $267,124.40.

n.   Hyrad was entitled to exemplary damages in the amount of $267,124.40 under Wis. Stat. § 895.446 as a result of Furrer's actions.

o.   Furrer knowingly and intentionally deceived Nelson and the Hyrad Board by understating his compensation.

5

p.    Furrer knowingly and intentionally used Hyrad funds to pay

himself compensation through Leader in excess of what he

reported to Nelson and Hyrad.

q.    Furrer had no authorization to receive the actual damage amounts

suffered by Hyrad.

r.    Furrer acted with intent to convert the amounts to his own use

and to the use of other companies he owned and controlled.

s.    Furrer's actions were performed maliciously and in intentional

disregard of the rights of Hyrad and Nelson.

t.    Furrer used his positions as director, president, primary manager,

and majority shareholder to further his private interests at the

expense of Hyrad and the other shareholders.

u.    The initial attorney's fees the state court awarded Hyrad as a result

of Furrer's actions totaled $247,000. The cost of investigation

Hyrad incurred as a result of Furrer's actions totaled $62,969.68.

As a result of a reconsideration of the Court's Memorandum

Decision dated August 30, 2010, the state court awarded Hyrad an

additional sum of attorney's fees and costs of $31,331.87, for a

total of $341,301.55 pursuant to Wis. Stat. § 895.446.

The Hyrad Judgment also determined other matters related to the

operation, control and liquidation of Hyrad. For example, it replaced the Hyrad

directors and ordered the election of new officers. It required engagement of a

manager to operate and wind down the business, identify assets, and liquidate

the assets. Further, it provided that if an appropriate manager could not be retained within a set time or there was any other impasse, an application for the appointment of a receiver could be filed for the purpose of winding down Hyrad and distributing the net proceeds.

Furrer filed two appeals of the Judgment. A Petition for Review was denied as were two Motions in the Supreme Court for Reconsideration. Undeterred, Furrer prosecuted an appeal in the Court of Appeals. Lacking success in that court, he filed yet another appeal to the Supreme Court while pursuing a Motion to Reconsider in the Court of Appeals. The eight years of continuous litigation by Furrer confirm an unremitting pattern of motions, appeals, and motions for reconsideration.

His trips through the appellate courts being unsuccessful, in 2014 he returned to the trial court with yet another motion to reopen or reconsider. He argued the court was mistaken in its conclusions and findings because there was a fraud on the court related to source documents and information that was available at the time of the original trial. Denying this motion, the trial court confirmed Furrer repeatedly had opportunities to raise these issues in a timely manner and failed to do so. Moreover, if there were relevant documents, he could have introduced them into evidence at trial but did not do so. What is more, he demonstrated his exhaustive efforts at appeals thus confirming his exercise of full litigation.

Following the exhaustive course of litigation, the state court granted a Motion to Appoint a Receiver. The Order appointing a receiver provides:

The receiver shall attempt to liquidate all assets of HYRAD and make best efforts to maximize the value of such liquidation; in addition, the receiver shall receive funds recovered from Mr. Furrer to satisfy the Judgment entered in this matter and shall distribute the proceeds according to the provisions of the Judgment; the receivership shall continue until the Judgment in this matter has been satisfied.

## DISCUSSION

The narrow questions presented by the summary judgment in this matter are (1) whether, under the principles of issue preclusion, this Court is bound by the decision rendered against the Defendant in state court; and (2) whether the factual and legal conclusions of that court satisfy the requirements to find a debt nondischargeable under either 11 U.S.C. § 523(a)(4) or (a)(6).

### A. **Summary Judgment**

Under Federal Rule of Civil Procedure 56, as applied through Fed. R. Bankr. P. 7056, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). This burden has two components: "an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.* In considering the moving party's evidence on summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the

8

party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).

For purposes of Fed. R. Civ. P. 56, a material fact is one related to a disputed matter that might affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*citing* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2725, pp. 93-95 (1983)); *Wadzinski v. Rieck (In re Rieck)*, 439 B.R. 698, 702 (Bankr. W.D. Wis. 2010). Summary judgment may therefore still be appropriate even where there is a minor factual dispute or discrepancy. *In re Rieck*, 439 B.R. at 701-02. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

### 1. Material Facts

In the present case, Furrer asserts there are genuine issues of material fact in dispute precluding the Court from finding summary judgment in favor of Hyrad. Specifically, he argues that there are disputed material facts with respect to whether Furrer held a position of "ascendancy" over the other directors, whether Hyrad can establish Furrer acted with the requisite malice under 11 U.S.C. § 523(a)(6), and whether Furrer turned over original source documents.

As discussed further in Part D.1. *infra*, Furrer acted in a fiduciary capacity. With 70% ownership of Hyrad's shares, Furrer served as President,

CEO, Treasurer, director, majority shareholder, and Hyrad's Chief Engineer.

Dovetailing the state court's findings with the federal standard of fiduciary

capacity, Furrer held a substantial natural advantage over other shareholders.

With respect to Furrer's malice argument, the Court need not address

that argument because summary judgment is proper under 11 U.S.C.

§ 523(a)(4).

Furrer makes much ado about whether he provided original source

documents in the state court proceedings. Once again, Furrer retreads

arguments raised and dismissed in the state court proceedings. Specifically, in

Judge Sciascia's decision on Furrer's motion for reconsideration of the state

court's January 16, 2015, order denying his motion to compel discovery, the

state court found:

> Assuming arguendo, that the original source material that Judge Bissonnette was referring to actually were in the boxes of documents brought into the courtroom, it was incumbent on Mr. Furrer to introduce them into evidence. He could have impeached the plaintiff's expert witness by having an original source document marked as an exhibit, showing it to the expert, and asking if the expert had reviewed it or considered it in arriving at his conclusions. He could have taken the stand and introduced each of the "original source documents" and testified as to their relevance in establishing the legitimate expenses that he apparently claims.
>
> The "production" of the original source materials, and the availability of them to the plaintiff's witnesses, are matters which *should* have been addressed at trial. The "production" of the original source materials, and the availability of them to the plaintiff's witnesses, are matters which *could* have been and should have been addressed in Mr. Furrer's appeals. Issues which could have been or should have been addressed at trial or on appeal cannot be subject of post appeal motions to reopen or reconsider.

In the present case, it is clear from the foregoing that Furrer seeks to revisit prior arguments in a new forum that could have been and should have been addressed during the six-day trial, or in one of his many appeals or motions for reconsideration.

### B. <u>Issue Preclusion Burden of Proof</u>

To establish issue preclusion, the burden of proof rests with the party asserting the doctrine. *Larsen v. Jendusa-Nicolai*, 442 B.R. 905, 912 (E.D. Wis. 2010), *aff'd*, 677 F.3d 320 (7th Cir. 2012). Similarly, the Plaintiffs bear the burden of proving, by a preponderance of the evidence, that the debts are excepted from discharge under 11 U.S.C. § 523(a)(4) or (a)(6). *Grogan v. Garner*, 498 U.S. 279 (1991). Exceptions to discharge are to be strictly construed against the moving creditor, here the Plaintiffs, and liberally construed in favor of debtor Furrer. *See Mueller v. Wisconsin Dep't of Workforce Dev. (In re Mueller)*, 243 B.R. 346, 347 (Bankr. W.D. Wis. 1999).

### C. <u>Issue Preclusion</u>

The Full Faith and Credit Act requires bankruptcy courts to recognize and give state court judgments the same preclusive effect the judgments would otherwise enjoy in state court. *Dollie's Playhouse, Inc. v. Nable Excavating, Inc. (In re Dollie's Playhouse, Inc.)*, 481 F.3d 998, 1000 (7th Cir. 2007); *see also Kriescher v. Gibson (In re Gibson)*, 521 B.R. 645, 652 (Bankr. W.D. Wis. 2014).

"Where a court of competent jurisdiction has previously ruled against a debtor upon specific issues of fact that independently comprise elements of a creditor's nondischargeability claim, the debtor may not seek to relitigate those

11

underlying facts in bankruptcy court, provided that the issues involved had been 'actually litigated.'" *French, Kezelis & Kominiarek, P.C. v. Carlson (In re Carlson)*, 224 B.R. 659, 663 (Bankr. N.D. Ill. 1998). It is well established that collateral estoppel principles (now referred to as issue preclusion) apply in discharge exception proceedings. *Grogan, supra*, 498 U.S. at 284.

Issue preclusion applies so long as the state court proceeding met the minimum requirements of due process. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 481-82 (1982). Section 1738 bars federal courts from employing their own rules of issue preclusion. 28 U.S.C. § 1738; *Kremer,* 456 U.S. at 481-82. Instead, federal courts must adhere to the rules chosen by the state from which the judgment is taken. *Id.* at 482. Here, the prior litigation between the parties took place in Wisconsin state court. Accordingly, Wisconsin law on issue preclusion applies.[1]

Under claim preclusion, "'a final judgment is conclusive in all subsequent actions between the same parties [or their privies] as to all matters which were litigated or which might have been litigated in the former proceedings.'" *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 550, 525 N.W.2d 723 (1995) (*quoting Lindas v. Cady*, 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994)). Claim preclusion attempts to separate meritorious claims from vexatious or repetitious ones. *Id.*

---

[1] Under Wisconsin law, the term "issue preclusion" replaces "collateral estoppel," and the term "claim preclusion" replaces *res judicata. Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 550 (1995).

On the other hand, "issue preclusion" refers to the effect of a judgment in barring re-litigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in a prior action. *Id.* Issue preclusion does not require an identity of parties. *Id.* at 551. For issue preclusion to apply, two criteria must be present: (1) whether the issue was actually litigated in the prior action and was necessary to the judgment, and (2) whether the application of issue preclusion would be fundamentally unfair. *First Weber Group, Inc. v. Horsfall,* 738 F.3d 767, 772-73 (7th Cir. 2013). This is applied regardless of whether the previous action was based on the same cause of actions as the second suit. It applies in nondischargeability actions. *Grogan,* 498 U.S. at 284.

### D. <u>Nondischargeability Under 11 U.S.C. § 523(a)(4)</u>

#### 1. Actually Litigated

The threshold question is whether the issues in this adversary proceeding were "actually litigated" in the state court. To cross that threshold, the Court must examine what the state court decided and how that dovetails with the decision this Court is being asked to reach.

The Hyrad Judgment was the result of findings made and conclusions reached after a six-day trial followed by additional post-trial briefing. The claims asserted by the Plaintiffs alleged the Defendant breached fiduciary duties and committed theft. The state court decision is conclusive and final.

There can be no doubt the issues were actually litigated. Furrer fully participated, presented a defense and testified. He had the opportunity to

introduce documents into evidence to support his defense and, as determined by the state courts in the myriad of proceedings in those courts, he did not do so. Thus, he certainly could have litigated the issue that documents existed to support his defense in the trial court and raising it in appeals or motions to reconsider confirm that, though unsuccessful, he did raise the issue on appeal. A Judgment was rendered. It is undisputed the Judgment is a final judgment.

In reaching its decision, the state court examined the intent required to establish theft under Wis. Stat. § 943.20. The state court cited the statute and its elements:

> Whoever does any of the following may be penalized. . . [if he] by virtue of his [ ] employment . . . [has] possession or custody of money or of a negotiable security, instrument, paper or other negotiable writing of another, intentionally uses, transfers, conceals, or retains possession of such money, security, instrument, paper or writing without the owner's consent, contrary to his [ ] authority, and with intent to convert to his [ ] own use or to the use of any other person except the owner.
>
> The elements of Section 943.20 are as follows:
>
> (1)    the defendant had possession of money belonging to another because of his employment;
>
> (2)    that the defendant intentionally used such money without the owner's consent and contrary to his authority;
>
> (3)    that the defendant knew that the use of the money was without the owner's consent and contrary to his proper authority; and
>
> (4)    that the defendant intended to convert the money to his own use (or the use of others in his family).

Wis. Stat. § 943.20(1)(a) (2009), Wis. Crim. Jury Instruction No. 1444.

The state court found the Plaintiffs proved by a preponderance of the evidence

that there were intentional acts of theft by the Defendant in violation of this statute.

Since "fiduciary capacity" has a technical meaning under federal law, the Court must compare whether the state court's finding with respect to Furrer's fiduciary capacity meets this technical definition. Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

The phrase "while acting in a fiduciary capacity" qualifies the words "fraud or defalcation." 4 *Collier on Bankruptcy* ¶ 523.10[1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Federal law defines section 523(a)(4)'s terms. *O'Shea v. Frain (In re Frain),* 230 F.3d 1014, 1017 (7th Cir. 2000). This means that in the bankruptcy context, federal law outlines the scope of the term "fiduciary capacity." *See id.* However, state law does factor into the analysis. 4 *Collier, supra,* ¶ 523.10[1][d]. The term "fiduciary capacity" has a technical definition where a plaintiff must show an express trust between the parties before a fiduciary relationship exists. *See In re Dawson*, 16 B.R. 343, 345 (Bankr. N.D. Ill. 1982).

The Seventh Circuit has succinctly defined fiduciary capacity as "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). Indeed, certain relationships are commonly recognized as involving fiduciary obligations under section 523(a)(4), such as the president of a private corporation entrusted with funds for a specific

purpose. *See Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir. 1990). Further, a director/shareholder relationship requires the principal to "repose a special confidence in the fiduciary." *In re Marchiando*, 13 F.3d at 1116. This relationship must be in existence prior to the breach. *In re Frain*, 230 F.3d at 1017. Wisconsin case law also establishes that directors owe their shareholders and the corporation fiduciary duties. *Rose v. Schantz*, 56 Wis. 2d 222, 228, 201 N.W.2d 593, 597 (1972).

In *In re Frain*, a case similar to the present one, the Seventh Circuit found a fiduciary relationship existed between a Chief Operating Officer ("COO") with 50% ownership in a closely held corporation and two minority director/shareholders each holding 25% of the shares. *In re Frain*. 230 F.3d at 1016-18. The three director/shareholders authorized the COO to make all of the day-to-day business decisions and all decisions affecting the normal operations of the corporation. *Id.* Major decisions required either a super-majority or unanimous vote. *Id.* Unfortunately for the minority shareholders, the COO approved his salary well above the formula contemplated in the shareholder agreement. *Id.*

The Seventh Circuit reasoned a difference in knowledge or power can form a fiduciary relationship, but an ascendancy relationship does not necessarily form when access to corporate financial information is available to other shareholder/directors. *See id.* at 1017. However, the *Frain* court also reasoned when a director/shareholder has power over the day-to-day operations, that director/shareholder has a natural advantage over other

16

shareholders. *Id.* This knowledge and information together with the 50%
ownership created a power imbalance that was substantially one-sided where
the COO ran the corporation as he saw fit. *See id.* at 1018.

Furrer was a fiduciary and his actions were performed in a fiduciary
capacity. As noted, under Wisconsin law directors owe their shareholders and
the corporation fiduciary duties. *Rose, supra,* 56 Wis. 2d at 228. Thus, as
President/CEO of Hyrad, Furrer acted in a fiduciary capacity during the time
in question.  Furrer owned 70% of the shares, served as President, CEO,
Treasurer, director, majority shareholder, and Hyrad's Chief Engineer. With
these roles, it is clear Furrer held a substantial natural advantage over other
shareholders. Even if Nelson had access to the same information belonging to
Hyrad, Leader was a management company solely owned by Furrer. There is no
indication anyone other than Furrer had access to its financial records or had
the ability to ensure Furrer was not misappropriating funds he caused Hyrad
to pay over to Leader. He had knowledge and information not available to the
other shareholders which, combined with his 70% ownership, created a power
imbalance. In effect, he ran Hyrad as he saw fit and the potential access of
Nelson to information does not negate the fiduciary duties owed by Furrer.

 Having found Furrer acted in a fiduciary capacity at the time the debt
was created, the next issue is whether his conduct constituted fraud or
defalcation.

Furrer made repeated claims to the Hyrad Board that he earned
somewhere between $40,000 to $76,000 a year through Hyrad. The state court

17

concluded Hyrad's Board did not approve any compensation for Furrer over and above $41,000. Despite the limitation on approved compensation, Furrer directed the transfer of approximately $1.77 million to companies in which he was the sole shareholder. Of the transferred funds, Furrer paid himself unsubstantiated compensation of $205,946.15 without Hyrad's approval. Furrer did not tell the Board of the money he directed Hyrad to pay Leader or that he was receiving compensation well above his Board-approved salary. In the middle of trial, the Defendant appointed his wife and brother as directors and had the family board approve a resolution authorizing retroactive compensation at the rate of $200,000 a year up to 2007, and then from 2007 on at $250,000. This conduct was, according to the circuit court, an admission the previous Hyrad Board had not approved a higher compensation.

While the state court did not make a specific finding of fraud,[2] it concluded Furrer knowingly and intentionally deceived Hyrad's Board into believing his annual compensation was lower than it actually was. Under *First Weber Grp. v. Horsfall,* issue preclusion may apply even where the state court addresses a different ultimate question. *See* 738 F.3d 767, 774 (7th Cir. 2013). In that circumstance, the issue becomes whether the ultimate finding of intentional deceit is the same as fraudulent intent. *Id.*

"Deceit" means "a false statement of fact made by a person knowingly or recklessly with the intent that someone else will act upon it." *Deceit*, Black's Law Dictionary (8th ed. 2004). The Seventh Circuit has on occasion used

---

[2] It did not need to do so because fraudulent intent is not an element under Wis. Stat. § 943.20.

18

"deceit" as synonymous as "fraud." *See In re Weber*, 892 F.2d 534, 538 (7th

Cir. 1989). Indeed, *Collier* defines "fraud" in the context of "while acting in a

fiduciary capacity" as "involving intentional deceit." 4 *Collier*, *supra*,

¶523.10[1][a]; *see, e.g., In re McDaniel*, 181 B.R. 883, 886-87 (Bankr. S.D. Tex.

1994). However, the Seventh Circuit used "fraud" and "deceit" synonymously

under section 523(a)(4)'s "embezzlement" exception. *In re Weber*, 892 F.2d at

538.

"Fraud" in the bankruptcy context is a generic term "embrac[ing] all the

multifarious means which human ingenuity can devise and which are resorted

to by one individual to gain an advantage over another by false suggestions or

by the suppression of truth." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir.

2000). "Fraud" includes all surprise, trick, cunning, dissembling, and any

unfair way by which another is cheated. *Id.*

The state court litigation unequivocally involved dissembling and

concealment, or knowing omission or misstatement of facts. At its root,

fraudulent intent was an issue actually litigated before the state court because

intentional deceit and fraudulent intent equate to the same thing since deceit

would fall under the auspices of "any unfair way by which another is cheated."

*See McClellan*, 217 F.3d at 893.

On the other hand, "defalcation" may refer to nonfraudulent breaches of

fiduciary duty. *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759-60, 185

L. Ed. 2d 922 (U.S. 2013). "Defalcation" means a failure to produce funds

entrusted to a fiduciary. 4 *Collier*, *supra*, at ¶ 523.10[1][b]. To establish

defalcation under section 523(a)(4), a creditor must show: (1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created. *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 388 (Bankr. N.D. Ill. 1994). In *Bullock*, the Supreme Court concluded that "defalcation" requires a culpable state of mind of either "knowledge" or "recklessness." *See id.* at 1759. Therefore, the remaining issue under "defalcation" is whether he failed to produce funds entrusted to him by Hyrad with the requisite intent.

The state court found the evidence presented at trial revealed Furrer, as an officer of Hyrad, directed the transfer of money to companies in which he was the sole shareholder. Of the transferred funds, he paid himself unauthorized compensation of $205,946.15. Furrer did not tell the Board how much money he directed Hyrad to pay Leader or that he knew he was receiving compensation well above the Board-approved salary. The state court considered Furrer's appointment of his wife and brother as directors in the middle of trial paired with a board resolution authorizing retroactive compensation to be evidence the payments were not authorized. This conduct satisfies section 523(a)(4)'s exception from discharge for any debt for defalcation while acting in a fiduciary capacity.

Dovetailing these findings with Wis. Stat. § 943.20's elements—and the state court's additional findings that Furrer knew (a) the Board set his compensation at $41,000, (b) he was taking more compensation, and (c) that he did not introduce source documents at trial establishing legitimate business

20

expenses—at a minimum the foregoing satisfies section 523(a)(4)'s "defalcation while acting in a fiduciary capacity." His conduct also meets the exception from discharge for "fraud while acting in a fiduciary capacity" because the state court also found he intentionally deceived the Hyrad Board into thinking he earned less compensation for the years in question. Section 523(a)(4)'s elements were actually litigated in state court. The facts found were essential to the state court judgment and directly bear on the claims before this Court.

### 2.  Fundamental Fairness

Turning to the second prong—whether applying issue preclusion would be fundamentally unfair—courts look to a variety of factors. *Lindas v. Cady*, 183 Wis. 2d 547, 558-559, 419 N.W.2d 345 (1994). Under such analysis, the following five factors are relevant: (1) the availability of review of the first judgment, (2) whether there are two distinct claims or intervening contextual shifts in the law, (3) differences in the quality or extensiveness of proceedings between the two courts, (4) shifts in the burden of persuasion in that the party seeking preclusion had a lower burden in the first matter than the second matter, and (5) whether matters of public policy are involved and the adequacy of the loser's opportunity or incentive to obtain a full and fair adjudication of the initial action. *Michelle T. v. Crozier*, 173 Wis. 2d 681, 668-69, 495 N.W.2d 327 (1993).

The first factor is met because Furrer availed himself of his rights of appeal. He was also fully represented by counsel. In fact, there was more than five years of continuous litigation in the state courts. Next, the claims before

this Court and the state court involve a breach of fiduciary duty and theft. There is some difference in the extensiveness of the proceedings since this matter is before the Court on a motion for summary judgment, whereas the state court proceeding culminated in a six-day trial and post-trial briefing. The state court proceeding culminated in an exhaustive decision, findings, conclusions, and judgment and those are before this Court. The Plaintiffs bore the same burden of proof in both proceedings, i.e., proof by a preponderance of the evidence. Thus there was no difference in the burden applied in each proceeding. Finally, there are no matters of public policy at issue here. Furrer had a full and fair opportunity to litigate the theft and fiduciary issues before the state court and exhausted all of his appeals before turning to the bankruptcy court. He had every incentive and opportunity to obtain a full and fair adjudication.

In sum, with regard to section 523(a)(4)'s exception from discharge for a debt incurred for fraud or defalcation while acting as a fiduciary, the Plaintiffs have demonstrated that issue preclusion applies to the excess and additional compensation claim amounts.

### E. Damages Subject to Application of Issue Preclusion

Having concluded the state court proceeding is subject to issue preclusion on the issue of whether there is a nondischargeable debt, the Court must consider whether the entire monetary award is subject to issue preclusion.

22

The state court judgment against Furrer was in the amount of $267,124.40 in compensatory damages as well as $267,124.40 in exemplary damages, for a total of $534,248.80. The court initially awarded Plaintiff $247,000 in attorney's fees and $62,969.68 for other costs of investigation and litigation, and upon reconsideration of its prior judgment an additional $31,331.87 in attorney's fees and costs, for a total of $341,301.55 pursuant to Wis. Stat. § 895.446.

### 1. Attorney's Fees and Costs

The Seventh Circuit has held that "when attorney fees are awarded in cases in which the underlying debt is later determined to be non-dischargeable by a bankruptcy court, the attorney fees may also be non-dischargeable." *In re Pawlinski*, 170 B.R. at 391 (*quoting Klingman v. Levinson*, 831 F.2d 1292, 1296 (7th Cir. 1987)). In *Klingman*, the Seventh Circuit found "ancillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt." *Klingman*, at 1296. Accordingly, where the state court awards attorney's fees that are attached to primary debts found by this Court to be nondischargeable, the attorney's fees and costs awarded to obtain that judgment are also nondischargeable. *In re Pawlinski*, at 391. Thus, the state court judgment of $341,301.55 for attorney's fees and costs is nondischargeable.

### 2. Exemplary Damages

The underlying debt found by this Court to be nondischargeable is $267,124.40. The state court awarded an equal sum in exemplary damages.

23

Under Wis. Stat. § 895.446, exemplary damages are permitted. However, there is a split of authority as to whether such punitive type damages are also dischargeable.

One line of cases holds that excepting punitive damages from discharge overcompensates the creditor and is contrary to the "fresh start" goal of bankruptcy. *In re Pawlinski*, at 392; *see, e.g., In re Alwan Bros. Co.*, 105 B.R. 886, 890 (Bankr. C.D. Ill. 1989); *In re Schmidt*, 36 B.R. 834, 836-37 (Bankr. D. Minn. 1984). In concluding punitive damages were dischargeable, Judge Altenberger in *In re Alwan Bros. Co.* reasoned section 523(a)(7) specifically provides for an exception to discharge for punitive damages for the benefit of a governmental unit. 105 B.R. at 891. Using the statutory construction rule of inclusion in one part of a congressional enactment of that which is excluded in another part speaks to congressional intent that the exclusion was purposeful, the Court found that reading section 523(a)(7) in correspondence with sections 523(a)(2), (a)(4), and (a)(6) Congress intended an award of punitive damages to a non-government unit to be dischargeable in bankruptcy. *Id.* at 891-92.

Other courts allow punitive damage awards to be excepted from discharge. *See Katahn Assocs. v. Wien (In re Wien)*, 155 B.R. 479, 489 (Bankr. N.D. Ill. 1993). In finding punitive awards nondischargeable, this line of cases hold that it is the debtor's conduct "and not the nature of the liability" that determines whether a debt is excepted from discharge. *In re Pawlinski*, at 392; *see also Stokes v. Ferris*, 150 B.R. 388 (W.D. Tex. 1992), *aff'd,* 995 F.2d 76 (5th Cir. 1993).

The state court awarded these exemplary damages based on the primary debt found to be nondischargeable. As the bankruptcy court in *Leeb v. Guy (In re Guy)* reasoned:

> [P]unitive damages flow from the primary debt just as do attorney fees and interest, and should not be simply excised from the judgment because this court might feel those damages are too harsh. The entire judgment should either be given collateral estoppel effect, or it should not be given such effect.

101 B.R. 961, 997 (Bankr. N.D. Ind. 1988).

Moreover, the Supreme Court in *Cohen v. de la Cruz*, 523 U.S. 213 (1998), addressed whether punitive damages are nondischargeable under section 523(a)(2)(A). In that case, the Court analyzed what the phrase "any debt" includes.

The *Cohen* Court reasoned the most straightforward reading of section 523(a)(2(A) is that it precludes discharge of "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud." *Id.* at 218 (emphasis added). In finding punitive damages were nondischargeable, the Court first considered that an obligation to pay punitive damages constitutes a "debt." *Id.* at 218. Section 101(12) of the Code defines a "debt" as a "liability on a claim." A "claim" is defined as a "right to payment." 11 U.S.C. 101(5)(A). Finally, a "right to payment" is "nothing more nor less than an enforceable obligation." *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 559 (1990).

Next, the Court reasoned an award of punitive damages constitutes an "enforceable obligation" in which the creditor has a corresponding "right to payment," making such obligation nondischargeable. *Cohen*, 523 U.S. at 218. Moreover, the Court also reasoned that section 523(a)(2)(A)'s potentially limiting language of, "to the extent obtained by," does not limit punitive damages from being included in what constitutes "any debt." See i*d.* The Court then turned to whether the phrase "debt for" imposed a limitation on whether "any debt" includes punitive damages. *Id.* at 219-20. The Court concluded the phrase "debt for" serves as introductory language, and the amount and type of debt is set by "any debt." *See id.* at 220-21. Thus, the Court reasoned section 523(a)'s "any debt" encompasses punitive damages. *Id.* at 223.

Indeed, at least one bankruptcy court in the Seventh Circuit has looked to state law to determine whether punitive damages are nondischargeable under section 523(a). In *In re Haskell*, the bankruptcy court disallowed the prevailing creditor an award of both attorney's fees and punitive damages. 475 B.R. at 923. However, in *Haskell* the court disallowed fees because it found the debtor/defendant's fraudulent conduct was based on a pre-petition contract, and there was no corresponding statutory or contractual basis to award fees or punitive damages. *See id.* at 923.

The *Haskell* decision is distinguishable from the present case. Here, the state court based the Plaintiff's judgment for attorney's fees and exemplary damages on Wis. Stat. § 895.446. As noted, the state court found Furrer had violated Wis. Stat. § 943.20 and awarded fees, costs, and exemplary damages

26

accordingly. Further, the state court, as opposed to the bankruptcy court, awarded fees and damages pursuant to an underlying primary debt under a state statute.

Similarly, "any debt" also modifies section 523(a)(4). Following the Supreme Court's reasoning in *Cohen*, and the bankruptcy court's reasoning in *In re Pawlinski*, where, as here, a creditor is able to show punitive damages arise from the same conduct as that creating the nondischargeable debt, such punitive damages are also nondischargeable. *See In re Pawlinski*, 170 B.R. at 393; *Cohen*, 523 U.S. at 223.

Moreover, the present case is more analogous to *Klingman v. Levinson, supra*. The attorney's fees, costs, and exemplary damages consist of statutory "ancillary obligations" that the state court attached to the primary debt. *Klingman*, 831 F.2d at 1296; *see also In re Pawlinski, supra,* at 393. Even applying *Cohen* narrowly, the state court awarded fees, costs, and damages according to Wis. Stat. §§ 895.466 and 943.20. Thus, even bankruptcy courts that distinguish *Cohen* have reasoned where the statute pursuant to which the cause of action has been litigated provides for fees, section 523(a)(4) excepts those fees from discharge. *See Clark & Gregory, Inc. v. Hanson (In re Hanson)*, 225 B.R. 366, 376 (Bankr. W.D. Mich. 1998).  The attorney's fees, costs, and exemplary damages are all nondischargeable.

### F. <u>Authority to Bring this Adversary Proceeding</u>

Following the state court judgment, Hyrad moved the court to appoint a receiver. On January 13, 2013, the state court entered an Order appointing

Wegner CPA's LLP as Receiver for Hyrad Corporation. As an affirmative defense, Furrer argues the Receiver, Peter Oettinger, lacks proper authority to bring this adversary proceeding. Pointing to paragraphs 11 and 12 of the Order Appointing Receiver for Hyrad Corporation, Furrer contends Hyrad's Board of Directors must first approve any actions taken by Hyrad including this adversary proceeding. This interpretation of the state court's order is inapposite to what it actually directs.

The state court vested Hyrad's receiver with the authority to gather and liquidate all assets of Hyrad and to maximize the value of such liquidation. In addition, the order directs the receiver to "receive funds recovered from Mr. Furrer to satisfy the Judgment entered in this matter . . . the receivership shall continue until the Judgment in this matter has been satisfied." Further, paragraph 11 explicitly provides that "to the extent [Hyrad's Board of Directors] continues to meet and conduct business, [it] shall prepare written reports of its meetings and send them to the receiver . . . ." Paragraph 12 states "[a]ll corporate action taken on behalf of Hyrad shall require prior approval of the receiver unless otherwise directed by the Court."

Provided this case represents an attempt to liquidate and realize one of Hyrad's assets, the Receiver does not need the Board's prior approval to bring this adversary proceeding. To that end, the order specifically requires the Receiver to recover funds from Furrer until the Judgment has been satisfied. It would be difficult for the Receiver to do so if he was unable to preserve the Judgment by ensuring it is nondischargeable.

28

In addition to the Receiver's authority to pursue this adversary, Nelson also has standing to commence this adversary as a derivative action under Wisconsin law.

Nelson[3] asserted both personal claims and shareholder derivative claims against Furrer in state court. The state court reasoned under Wisconsin law that both Hyrad and Nelson properly brought Claims 1, 3, and 4 as derivative actions because these claims were direct harms to the corporation. Under Wis. Stat. § 180.0741, a shareholder may commence a derivative proceeding provided they were a shareholder at the time of the alleged wrongdoing, and they fairly and adequately represented the interests of the corporation enforcing the right of the corporation. Wis. Stat. § 180.0741.

Here, it is undisputed that Nelson held 20% ownership in Hyrad during the time in question, and there was no objection or appeal in the state proceedings that Nelson improperly represented the interests of the corporation. Based on a review of the state court judgment and relief sought, the Court concludes Nelson's actions are in the best interest of the corporation. Accordingly, these state court derivative claims form the basis for the Hyrad Judgment and are entitled to nondischargeability as set forth herein.

## CONCLUSION

Because the Court has determined the debt owed to the Plaintiffs is nondischargeable under section 523(a)(4), their claim under section 523(a)(6)

---

[3] As the state court determined, the costs awarded to Hyrad are to be paid first. Upon payment in full of the costs and fees of the Hyrad counsel, if Nelson paid costs or fees, he is then entitled to be paid those costs and fees by Hyrad.

need not be addressed. In addition, this debt should not be reconfigured as a debt resulting from a willful and malicious injury. *See Joyce v. Wish (In re Wish)*, 472 B.R. 763 (Bankr. N.D. Ill. 2012) (recognizing limitations on section 523(a)(6)).

Based upon the foregoing findings of fact and conclusions of law, the Plaintiff Hyrad is entitled to a judgment of nondischargeability against Furrer for actual damages of $267,124.40,[4] exemplary damages of $267,124.40, and attorney's fees and costs of $341,301.55. The total amount of $875,550.35 is excepted from Furrer's discharge under 11 U.S.C. § 523(a)(4). Therefore, summary judgment is granted.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be entered separately.

Dated: December 23, 2016.

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge

---

[4] The state court awarded 12% per annum interest under Wis. Stat. § 814.04(4) from the date of the state court decision forward.